## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| RYAN WODARSKI, X | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| AIMMUNE THERAPEUTICS, INC., ) | **COMPLAINT FOR** |
| JAYSON D.A. DALLAS, MARK T. IWICKI, ) | **VIOLATIONS OF THE** |
| GREG BEHAR, BRETT K. HAUMANN, ) | **SECURITIES EXCHANGE ACT** |
| MARK D. MCDADE, STACEY D. ) | **OF 1934** |
| SELTZER, PATRICK G. ENRIGHT, ) | |
| KATHRYN E. FALBERG, SPN ) | **JURY TRIAL DEMAND** |
| MERGERSUB, INC., and SOCIÉTÉS DES ) | |
| PRODUITS NESTLÉ S.A., ) | |
| ) | |
| Defendants. X | |

Plaintiff Ryan Wodarski ("Plaintiff") alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1. Plaintiff brings this action as a stockholder of Aimmune Therapeutics, Inc. ("Aimmune" or the "Company") against Aimmune's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934, 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14d-9, 17 C.F.R. 240.14d-9, arising out of the Board's attempt to sell the Company to Sociétés des Produits Nestlé S.A. through its wholly-owned subsidiary SPN MergerSub, Inc. (collectively "Nestlé").

2. Defendants have violated the above-referenced sections of the Exchange Act by causing a materially incomplete and misleading solicitation statement (the "14D-9") to be filed with the Securities and Exchange Commission ("SEC") on September 14, 2020.  The 14D-9

1

recommends that Aimmune stockholders tender their shares in favor of a proposed transaction (the "Proposed Transaction") whereby Aimmune is acquired by Nestlé.  The Proposed Transaction was first disclosed on August 31, 2020, when Aimmune and Nestlé announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which Nestlé will acquire all of the outstanding shares of common stock of Aimmune for $34.50 per share (the "Merger Consideration").  The deal is valued at approximately $2.6 billion and is expected to close in the fourth quarter of 2020.

3.      The 14D-9 is materially incomplete and contains misleading representations and information in violation of Sections 14(e) and 20(a) of the Exchange Act.  Specifically, the 14D-9 contains materially incomplete and misleading information concerning the sales process, financial projections prepared by Aimmune's management, as well as the financial analyses conducted by J.P. Morgan Securities LLC ("JPMorgan") and Lazard Frères & Co. LLC ("Lazard"), Aimmune's financial advisors.

4.      For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin defendants from taking any steps to consummate the Proposed Transaction, including filing any amendment to the 14D-9 or otherwise causing an amendment to the 14D-9 to be disseminated to Aimmune's stockholders, unless and until the material information discussed below is included in any such amendment or otherwise disseminated to Aimmune's stockholders.  In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the defendants' violations.

## PARTIES

5.      Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Aimmune.

2

6.      Defendant Aimmune is a corporation organized and existing under the laws of the State of Delaware.   The Company's principal executive offices are located at 8000 Marina Boulevard, Suite 300, Brisbane, California 94005.  Aimmune's common stock trades on NASDAQ under the ticker symbol "AIMT."

7.      Defendant Jayson D.A. Dallas ("Dallas") has been President, Chief Executive Officer ("CEO") and a director of the Company since 2018.

8.      Defendant Mark T. Iwicki ("Iwicki") has been a director of the Company since 2015.

9.      Defendant Greg Behar ("Behar") has been a director of the Company since 2016. Defendant Behar is the CEO of Nestlé Health Science, of which Nestlé is a part.

10.      Defendant Brett K. Haumann ("Haumann") has been a director of the Company since 2018.

11.      Defendant Mark D. McDade ("McDade") has been a director of the Company and Chair of the Board since 2015.

12.      Defendant Stacey D. Seltzer ("Seltzer") has been a director of the Company since 2015.

13.      Defendant Patrick G. Enright ("Enright") has been a director of the Company since 2013.

14.      Defendant Kathryn E. Falberg ("Falberg") has been a director of the Company since 2015.

15.      Defendants Dallas, Iwicki, Behar, Haumann, McDade, Seltzer, Enright, and Falberg are collectively referred to herein as the "Board."

16.     Defendant Sociétés des Produits Nestlé S.A. is a *société anonyme* organized under the laws of Switzerland.

17.     Defendant SPN MergerSub, Inc. is a Delaware corporation and is a wholly-owned subsidiary of Sociétés des Produits Nestlé S.A.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(e) and 20(a) of the Exchange Act.

19.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) a significant amount of the conduct at issue took place and had an effect in this District; and (ii) Aimmune is incorporated in this District.

## SUBSTANTIVE ALLEGATIONS

### A.  Background of the Company and the Proposed Transaction

21.     Aimmune develops treatments for food allergies.  These treatments are designed to desensitize people to food allergens, which would reduce allergic reactions and allergy symptom severity.  Aimmune's lead product is PALFORZIA, a powder indicated to mitigate allergic reactions to peanuts.  In January 2020, PALFORZIA received FDA approval for sale and marketing in the United States for use in patients four years old and older, and the Company is conducting clinical trials for the use of PALFORZIA in children younger than four years old.

Aimmune stated in its Form 10-K filed with the SEC on February 27, 2020 that it intended to commercialize PALFORZIA in Europe once it received UK and EU approvals.  The Company also is developing treatments for egg allergies and multiple-nut allergies, as well as a treatment to be used in conjunction with PALFORZIA to improve treatment outcomes.

22.     Just a few weeks after Aimmune filed its Form 10-K, the COVID-19 pandemic reached the United States.  In March 2020, states and cities closed non-essential businesses and directed people to work and stay at home.  The Company's efforts to begin selling PALFORZIA were paused, as the treatment first needs to be administered in a certified healthcare setting. Despite the delay, Aimmune reported in a press release dated May 11, 2020, that allergists were still enthusiastic about using PALFORZIA when they were able to reopen their offices.  And despite COVID-19's impact on the United States and countries throughout the world, Aimmune expected that the EU review of PALFORZIA would stay on track, with at least one approval received by the end of 2020.

23.     Aimmune's optimism was not misplaced.  On June 8, 2020, the Company reported data from patients who received two years of daily PALFORZIA treatments.  The data showed that more than 80% of patients were desensitized to higher amounts of peanut protein, and a majority of patients reported fewer treatment-related adverse events.  Aimmune released the full results of its European phase 3 trial on July 21, 2020.  That trial showed that patients receiving PALFORZIA experienced desensitization to peanuts after nine months of treatment.  And as the Company announced in a press release issued on July 30, 3030, allergists in the United States were already beginning to offer PALFORZIA to their patients, which was earlier than the Company expected.

24.    Despite Aimmune's upward trajectory, the Company announced on August 31, 2020 that it had entered into the Merger Agreement with Nestlé.

25.    According to the press release issued on August 31, 2020 announcing the Proposed Transaction:

### Aimmune Therapeutics Enters Definitive Agreement with Sociétés des Produits Nestlé S.A., Part of Nestlé Health Science

- Sociétés des Produits Nestlé S.A., part of Nestlé Health Science, to acquire Aimmune for $34.50 per share in cash, representing a total equity value of $2.6 Billion and a 174% premium to Aimmune's closing price on August 28, 2020

- Aimmune's PALFORZIA® [Peanut (*Arachis hypogaea*) *Allergen Powder-dnfp*] is the world's first approved treatment for peanut allergy

- Transaction expected to be completed in the fourth quarter of 2020

**Brisbane, CA, August 31, 2020** – Aimmune Therapeutics Inc. (Nasdaq: AIMT), a biopharmaceutical company developing and commercializing treatments for potentially life-threatening food allergies, today announced that it has entered into a definitive agreement for Sociétés des Produits Nestlé, S.A. to acquire Aimmune for $34.50 per share in an all-cash transaction, implying a fully-diluted equity value of $2.6 billion. Sociétés des Produits Nestlé, S.A. is a part of Nestlé Health Science (NHSc) and a wholly owned subsidiary of Nestlé S.A. The agreement was unanimously approved by all of the independent members of the Board of Directors of Aimmune. Greg Behar, CEO of Nestlé Health Sciences and an Aimmune Director, abstained due to his position with Nestlé Health Science.

"The agreement with Nestlé recognizes the value created by years of commitment and dedication to our mission by the team at Aimmune. Delivering PALFORZIA, the world's first treatment for food allergy, is a game-changing proposition in the bio pharmaceutical industry and is transformative for the lives of millions of people living with potentially life-threatening peanut allergy," said Jayson Dallas, MD, President and Chief Executive Officer of Aimmune. "This acquisition provides strong value for our shareholders and ensures a level of support for PALFORZIA and our pipeline that will further enhance their potential for patients around the world living with food allergies. Aimmune appreciates the continued strong collaboration with Nestlé Health Science dating back to 2016 through their support as a shareholder and board member, as well as through their consumer/nutrition strength and experience. Their extensive capabilities and global reach, as well as their alignment with our vision of pioneering treatments and solutions for food allergies, are a strong fit for our company."

"This transaction brings together Nestlé's nutritional science leadership with one of the most innovative companies in food allergy treatment," said Nestlé Health Science CEO Greg Behar. "Together, we will be able to create a world leader in food allergy prevention and treatment and offer a wide range of solutions that can transform the lives of people around the world living with food allergies."

The transaction is expected to close in the fourth quarter of 2020, pending the satisfaction of all conditions to the completion of the tender offer. Until that time, Aimmune will continue to operate as a separate and independent company.

Aimmune's financial advisors are J.P. Morgan Securities LLC and Lazard. Latham & Watkins LLP is acting as legal counsel for Aimmune.

**Transaction Details**

Under the terms of the merger agreement, Nestlé S.A.'s wholly-owned subsidiary, Société des Produits Nestlé S.A. (SPN), will commence a cash tender offer to acquire all outstanding shares of Aimmune common stock that are not already owned by NHSc for $34.50 per share in cash, and Aimmune agreed to file a recommendation statement containing the unanimous recommendation of the independent members of the Aimmune board that Aimmune stockholders tender their shares to SPN. Following the completion of the tender offer, Nestlé expects to promptly consummate a merger of Aimmune with a subsidiary of SPN, in which shares of Aimmune that have not been tendered in the tender offer will be acquired by SPN and converted into the right to receive the same cash price per share as paid in the tender offer.

The closing of the tender offer is subject to customary closing conditions, including the tender of a majority of outstanding Aimmune shares on a fully diluted basis which shall include the shares of Aimmune common stock currently held by Nestlé and its affiliates and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act and antitrust approvals in Germany. The merger agreement includes customary termination provisions for both Aimmune and Nestlé.

**INDICATION**

PALFORZIA is an oral immunotherapy indicated for the mitigation of allergic reactions, including anaphylaxis, that may occur with accidental exposure to peanut. PALFORZIA is approved for use in patients with a confirmed diagnosis of peanut allergy. Initial Dose Escalation may be administered to patients aged 4 through 17 years. Up-Dosing and Maintenance may be continued in patients 4 years of age and older.

PALFORZIA is to be used in conjunction with a peanut-avoidant diet.

Limitations of Use: Not indicated for the emergency treatment of allergic reactions, including anaphylaxis.

**B. The Materially Incomplete and Misleading 14D-9**

26.     The Individual Defendants must disclose all material information regarding the Proposed Transaction to Aimmune's stockholders so that they can make a fully informed decision whether to tender their shares in favor of the Proposed Transaction.

27.     On September 14, 2020, defendants filed the 14D-9 with the SEC.  A crucial purpose of the 14D-9 is to provide the Company's stockholders with all material information necessary for them to make an informed decision on whether to tender their shares in favor of the Proposed Transaction.  However, significant and material facts were not provided to Plaintiff and other Aimmune stockholders.  Without such information, Plaintiff and other Aimmune stockholders cannot make a fully informed decision concerning whether or not to tender their shares in favor of the Proposed Transaction.

> *Materially Misleading Statements/Omissions Regarding the Management-Prepared Financial Forecasts*

28.     The 14D-9 discloses management-prepared financial projections for the Company which are materially misleading.  The 14D-9 indicates that in connection with the rendering of JPMorgan's fairness opinion, JPMorgan reviewed "certain internal financial analyses and forecasts prepared by the management of the Company relating to its business."  Lazard reviewed "various financial forecasts and other data provided to it by the Company relating to the business of the Company" in rendering its fairness opinion.  Accordingly, the 14D-9 should have, but failed to, provide certain information in the projections that Aimmune's management provided to the Board and JPMorgan and Lazard.

29.    The 14D-9 fails to disclose the relationship between the long-range plans discussed by the Board, the financial forecasts used by JPMorgan and Lazard in their analyses, and the projections disclosed in the 14D-9.  For the financial projections that were published, the 14D-9 fails to disclose all of the line items used to calculate EBIT as well as unlevered free cash flow from 2020 to 2035, including stock-based compensation expense, taxes, expected working capital requirements, depreciation, amortization and capital expenditures.  With respect to the Early Long-Term Projections, the 14D-9 fails to disclose the impact of the assumptions on the projections and does not disclose the estimated operational costs that impact the projections.  The 14D-9 further fails to provide the Early Long-Term Projections that are not adjusted for the listed assumptions.

### *Materially Incomplete and Misleading Disclosures Concerning the Flawed Process*

30.    Aimmune entered a two-year collaboration with a Nestlé affiliate in November 2016.  As part of the agreement, Nestlé purchased 15.1% of Aimmune's common stock in exchange for $145 million.  About a year later, Aimmune entered into a clinical collaboration with Regeneron and Sanofi to study PALFORZIA's treatment in conjunction with adjunctive dupilumab.  Regeneron agreed to pay for the trial, while Aimmune provided a supply of PALFORZIA and materials to determine desensitization.

31.    In February 2018, Nestlé purchased another $30 million worth of Aimmune stock. This purchase increased Nestlé's holdings to 19%.

32.    Aimmune agreed to extend its collaboration agreement with Nestlé in November 2018, with Nestlé paying $98 million for more Aimmune common stock.  The extension created a pipeline between the two companies, with Nestlé providing advice and expertise to the Company on oral immunotherapy programs.  The extension also allowed Nestlé to name one director to

9

Aimmune's Board so long as Nestlé held at least 10% of Aimmune's outstanding stock.  Nestlé named defendant Behar as its representative on the Board.

33.     The Company's collaboration with Aimmune was extended again in February 2020.  At that time, Nestlé invested $200 million in Aimmune through a purchase of both common stock and Series A Preferred stock.  The February 2020 investment extended the collaboration agreement through November 2021, but capped Nestlé's ownership at 19.9% and increased to 14% the ownership required for Nestlé to name a director to the Board.

34.     In the second quarter of 2020, Aimmune began reaching out to potential partners for commercializing PALFORZIA in Europe.  One such potential partner was Nestlé, and Nestlé was interested.  The 14D-9 does not disclose that according to the collaboration agreement, should Aimmune seek a partner or collaborator for an oral immunotherapy program during the collaboration, Nestlé has a three-month period to negotiate exclusively with the Company.  That includes commercialization plans for PALFORZIA.  The 14D-9 further fails to disclose whether Nestlé invoked the three-month exclusivity period, or whether there were further discussions with Nestlé about transactions relating to commercialize PALFORZIA.

35.     By July 7, 2020, Nestlé had recommended to its parent company, Nestlé S.A., that Nestlé acquire Aimmune.  Nestlé S.A. had conducted an exploratory review of Aimmune's business by then, as well.  The 14D-9 does not disclose whether the exploratory review included information obtained by defendant Behar in his role as a director of Aimmune, and when that recommendation first had been made.

36.     Three days later, Nestlé representatives proposed that Nestlé and the Board discuss a potential acquisition of the Company.  Nestlé suggested that $30.00 per share was an appropriate price for starting discussions.  The 14D-9 does not disclose whether defendant Behar was one of

the Nestlé representatives present for the call, nor does the 14D-9 disclose which members of the Board were present.

37.     In fact, the 14D-9 fails to disclose defendant Behar's role throughout the sales process.  At the beginning of the background section, the 14D-9 notes that references to defendant Behar refer to his role at Nestlé, and the Board meetings and discussions did not include him.  As the CEO of Nestlé, it is probable that defendant Behar was involved in discussions and negotiations between the two companies.  Yet there are numerous instances where the 14D-9 mentions only "members of Nestlé's management" and does not state whether defendant Behar is included.  That includes discussions between members of Aimmune's management and members of Nestlé's management on July 14, 2020, July 20, 2020, July 23, 2020, August 4, 2020, August 6, 2020, August 24, 2020, and August 26, 2020. Similarly, the 14D-9 fails to disclose whether defendant Behar was present when Aimmune's management made a presentation to Nestlé's management on July 31, 2020, or if defendant Behar was one of the designated representatives of the Nestlé board of directors that approved the offer of $34.50 per share sent to Aimmune on August 27, 2020.

38.     Just as important, the 14D-9 fails to disclose whether there were other Board meetings held in July and August 2020.  The 14D-9 states that defendant Behar was not present at the Board meetings described in the 14D-9.  Stockholders need to know if there were other Board meetings held that discussed Aimmune's operations and, if so, whether defendant Behar attended those meetings.  This information would allow stockholders to decide if defendant Behar was faithfully executing his duties to Aimmune, or if he was helping Nestlé in its bid for the Company.

39.     Nestlé hoped to begin discussions with the Company about a potential acquisition, opening with a price of $30.00 per share on July 10, 2020.  On July 13, 2020, the Board discussed

11

Aimmune's value, as well as management's business plans and objectives for 2020. The Board also received a preliminary analysis of Aimmune's potential valuations from Lazard. The 14D-9 does not disclose the business plans and objectives for 2020, nor Lazard's preliminary valuations. The 14D-9 also does not disclose whether Lazard relied on any internal financial information for their analysis. However, the Board knew that $30.00 per share was not high enough to properly value the Company.

40.     On July 20, 2020, Nestlé informed Aimmune that it could potentially go up to $32.50 per share if that would start discussions. The Board determined that was not a proper valuation for the Company. Nestlé increased that to $34.00 per share on August 4, 2020. The Board agreed that was enough to continue considering discussions, but not to waive a standstill agreement with Nestlé. Instead, the Board agreed to a limited waiver of the standstill agreement to allow Nestlé to conduct some due diligence of the company with the aim of an increased valuation. That limited waiver was signed on August 8, 2020.

41.     Between August 4, 2020, when Nestlé indicated a valuation of Aimmune of $34.00 per share, and August 24, 2020, when Nestlé expressed concerns of a valuation any higher than that, the Board, Lazard, and J.P. Morgan were presented with more information on the Company's prospects. On August 4, 2020, management presented to the Board the Company's long-range plans. On August 21, 2020, the Board, Lazard, and J.P. Morgan attended a meeting where Aimmune's management presented the Company's potential long-term plans, including potential partners for commercializing PALFORZIA in Europe. The 14D-9 fails to disclose the long-range plans and prospects discussed at either meeting. But the Board and its financial advisors understood that $34.00 per share was not a full valuation of Aimmune. Indeed, both JPMorgan and Lazard informed Nestlé's financial advisor that $34.00 "did not reflect a full valuation." 14D-

9 at 22.   On August 25, 2020, both JPMorgan and Lazard discussed with the Board their preliminary financial analyses of a transaction at $34.00 per share (which the 14D-9 does not disclose).   After that discussion, the Board directed JPMorgan and Lazard to tell Nestlé they wanted a price over $35.00.   The Board and its financial advisors agreed that $34.00 per share was not enough.

42.   While the Board may have believed that $34.00 per share did not properly value Aimmune, it appears that some members of the Board were in favor of a transaction at that price. A discussion on August 25, 2020 led the Board to direct defendant McDade to discuss with defendant Behar that there was no consensus among the other directors as to whether to move forward with a transaction at $34.00 per share.   The 14D-9 does not disclose which director (or directors) was in favor of moving forward.   This information is crucial, as at least one director may have had a competing interest.

43.   Nestlé is not the Company's only large stockholder.   As of April 1, 2020, there are six investors who hold a combined 54% of the Company's shares.   The next largest stockholder after Nestlé is Longitude Venture Partners II, L.P. ("Longitude Venture Partners"), which first invested in Aimmune in 2013 and holds 9.22% of the Company's shares.   Defendant Enright is the founder and Managing Director of Longitude Venture Partners and is Longitude Venture Partners' named designate on the Board.

44.   Like defendant Behar, defendant Enright was required to act as a faithful fiduciary to both Aimmune and his employer.   But if Aimmune was acquired at $34.00 per share, defendant Enright's firm stood to make a lot of money.   Longitude Venture Partners invested $17 million in Aimmune in November 2013 and was one of six investors for Aimmune's $80 million financing round in March 2015.   According to the 14D-9, Longitude Venture Partners will receive $210.9

million when the Proposed Transaction closes.  At $34.00 per share, Longitude Venture Partners would have received just $3 million less.  And the timing was right for an exit from Aimmune. Longitude Venture Partners was seeking investors for a new fund, aiming for $550 million when the fund was announced in March 2019.  On September 23, 2020, Longitude Venture Partners announced that it had raised $585 million.  A large profit on its Aimmune investment would mean a large payday for the firm and happy investors.  And happy investors are good for business.

45.     On August 26, 2020, Nestlé informed Aimmune that it was prepared to make an offer at $34.50 per share.  This was an increase of 1.47% from its previous price offer.  While the Board had agreed for some time that $34.00 per share did not fully value the Company, and JPMorgan and Lazard agreed that $34.00 per share was not a proper value, the Board agreed to $34.50 per share.  The 14D-9 states that the Board "believed that the [Merger Consideration] of $34.50 per Share represented full and fair value."   14D-9 at 26.  At the same time, the Board acknowledged that before the COVID-19 pandemic, Aimmune's shares had traded higher than the Merger Consideration.  And the Board acknowledged that the Merger Consideration might not reflect the full value of the Company after economic conditions improved.  The 14D-9 does not disclose the basis for the Board determining that the Merger Consideration reflected the full value of Aimmune.

### *Materially Incomplete and Misleading Disclosures Concerning JPMorgan and Lazard's Financial Analyses*

46.     The 14D-9 fails to disclose key information relating to JPMorgan's and Lazard's financial analyses, specifically concerning the valuation of Aimmune.  Despite both financial advisors informing Nestlé that $34.00 per share did not reflect a full valuation, each submitted fairness opinions that suggest that $34.50 per share is on the high end of a fair price.  For example, JPMorgan's *Public Trading Multiples Analysis* indicated an implied equity value for Aimmune of

$10.25 to $34.50 per share, while the *Discounted Cash Flow Analysis* rendered an implied equity value for Aimmune of $23.50 to $34.00 per share.  Lazard's *Selected Public Companies Analysis* rendered an implied equity value for Aimmune of $16.00 to $30.10 per share and its *Selected Precedent Transactions Analysis* indicated an implied equity value for Aimmune of $25.55 to $32.70 per share.

47.    The financial analyses also suffer from misstatements or omissions that render the 14D-9 misleading.  With respect to JPMorgan's *Public Trading Multiples Analysis*, the 14D-9 fails to disclose the basis for using estimated revenues for 2024 for the analysis, and with respect to JPMorgan's *Selected Transaction Analysis*, the 14D-9 fails to disclose the basis for selecting the fifth calendar year after a transaction was announced for its analysis.   As for JPMorgan's *Discounted Cash Flow Analysis*, the 14D-9 fails to disclose the inputs and assumptions for selecting growth rates of -40% to -20% and discount rates of 10.0% to 14.0%, the basis for adjusting the analysis for an assumed equity raise of $125 million in 2021, and the number of outstanding, fully-diluted shares.  Additionally, the 14D-9 fails to disclose the firm value as utilized in JPMorgan's analyses, and the information underlying that calculation (equity value, net debt and net cash).

48.    The 14D-9 also fails to disclose crucial information from Lazard's financial analyses.  With respect to Lazard's *Discounted Cash Flow Analysis*, the 14D-9 fails to disclose the inputs and assumptions for selecting growth rates of -40% to -20% and discount rates of 10.0% to 12.0%, and the number of outstanding, fully-diluted shares as of August 26, 2020.  With respect to Lazard's *Selected Public Companies Analysis*, the 14D-9 fails to disclose the basis for using estimated revenues for 2023 for the analysis.   Similarly, with respect to Lazard's *Selected*

*Precedent Transactions Analysis*, the 14D-9 fails to disclose the basis for selecting three-year forward revenues for its analysis.

49.     Finally, the 14D-9 fails to disclose information concerning potential conflicts of interest on the part of the financial advisors.  For example, the 14D-9 does not disclose whether JPMorgan performed any services for Aimmune for which it received compensation.  The 14D-9 further fails to disclose what fees, if any, JPMorgan received from Nestlé between August 1, 2020 and August 28, 2020.  Lazard's fairness opinion states that Lazard performed services for L'Oréal S.A., which Lazard states is an affiliate of Nestlé, but the 14D-9 fails to disclose what services were provided to L'Oréal S.A. or how much compensation Lazard received.  The 14D-9 further fails to disclose whether Lazard performed services for Aimmune or Nestlé and, if so, what compensation was received.

50.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.  And without all material information, Aimmune's stockholders are unable to make a fully informed decision in connection with the Proposed Transaction and face irreparable harm, warranting the injunctive relief sought herein.

51.     In addition, the Individual Defendants knew or recklessly disregarded that the 14D-9 omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

52.     Specifically, the Individual Defendants undoubtedly reviewed the contents of the 14D-9 before it was filed with the SEC.  Indeed, as directors of the Company, they were required to do so.  The Individual Defendants thus knew or recklessly disregarded that the 14D-9 omits the

material information referenced above and contains the incomplete and misleading information referenced above.

53.     Further, the 14D-9 indicates that on August 28, 2020, JPMorgan and Lazard reviewed with the Board their financial analysis of the Merger Consideration and delivered to the Board oral opinions, which were confirmed by delivery of written opinions of the same date, to the effect that the Merger Consideration was fair, from a financial point of view, to Aimmune's stockholders.  Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning JPMorgan and Lazard's financial analyses which has been omitted from the 14D-9, and thus knew or should have known that such information has been omitted.

54.     Plaintiff is immediately threatened by the wrongs complained of herein, and lacks an adequate remedy at law.  Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Plaintiff will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff Against All Defendants for Violations of
Section 14(e) of the Exchange Act and Rule 14d-9**

55.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

56.     Defendants have filed the 14D-9 with the SEC with the intention of soliciting Aimmune stockholder support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the 14D-9, which fails to provide the material information referenced above.

57.     In so doing, defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Aimmune, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).

58.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading. . . ." 15 U.S.C. § 78n(e).

59.     Specifically, and as detailed above, the 14D-9 violates Section 14(e) and Rule 14d-9 because it omits material facts concerning: (i) management's financial projections; (ii) the value of Aimmune's shares and the financial analyses performed by JPMorgan and Lazard in support of their fairness opinions; and (iii) the sales process.

60.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the 14D-9 is materially misleading and omits material information that is necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the 14D-9 states that JPMorgan and Lazard reviewed and discussed their financial analyses with the Board during various meetings including on August 28, 2020, and further states that the Board relied upon JPMorgan and Lazard's financial analyses and fairness opinions in connection with approving the Proposed Transaction.  The Individual Defendants knew or should have known that the material information identified above has been omitted from the 14D-9, rendering the sections of the 14D-9 identified above to be

materially incomplete and misleading.

61.     The misrepresentations and omissions in the 14D-9 are material to Plaintiff and other Aimmune stockholders, who will be deprived of their right to make an informed decision whether to tender their shares if such misrepresentations and omissions are not corrected prior to the end of the tender offer.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

62.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

63.     The Individual Defendants acted as controlling persons of Aimmune within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Aimmune and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the 14D-9 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

64.     Each of the Individual Defendants was provided with or had unlimited access to copies of the 14D-9 and other statements alleged by Plaintiff to be misleading prior to the time the 14D-9 was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The 14D-9 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the 14D-9.

66.     In addition, as the 14D-9 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The 14D-9 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

67.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

68.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(e) and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and against the defendants jointly and severally, as follows:

A.      Preliminarily and permanently enjoining defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing any amendment

to the 14D-9 with the SEC or otherwise disseminating an amendment to the 14D-9 to Aimmune stockholders unless and until defendants agree to include the material information identified above in any such amendment;

B.      Preliminarily and permanently enjoining defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until defendants disclose the material information identified above which has been omitted from the 14D-9;

C.      In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff rescissory damages;

D.      Directing the defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 28, 2020              **RIGRODSKY & LONG, P.A.**

                                      By:   */s/ Gina M. Serra*
                                            Brian D. Long (#4347)
**OF COUNSEL:**                             Gina M. Serra (#5387)
                                            300 Delaware Avenue, Suite 210
**ROWLEY LAW PLLC**                         Wilmington, DE 19801
Shane T. Rowley                             Telephone: (302) 295-5310
Danielle Rowland Lindahl                    Facsimile: (302) 654-7530
50 Main Street, Suite 1000                  Email: bdl@rl-legal.com
White Plains, NY 10606                      Email: gms@rl-legal.com
Telephone: (914) 400-1920
Facsimile: (914) 301-3514                   *Attorneys for Plaintiff*